## FISHER ET AL., TRUSTEES, v. BROWER ET AL.

|159  139|
|f159 537|

### [No. 19,612.   Filed June 24, 1902.]

SCHOOLS.—*State University.*—*Endowment Fund.*—The permanent endowment fund of the State University is entitled to the same constitutional and statutory protection as is accorded to public school funds.  *pp. 141–144.*

SAME.—*State's Trust Fund.*—*Security.*—*Power of Legislature.*—For the protection of the State's trust fund, the legislature has power to make the security therefor paramount to tax and all other liens created or authorized by the State.  *p. 145.*

SAME.—*Mortgage to Secure State University Endowment Fund.*—*Sale.*—*Priority.*—The purchaser of real estate, at the permanent endowment fund mortgage sale by the State Auditor, takes the real estate free from tax and assessment liens incurred after the execution of and during the time the land was under the mortgage.  *pp. 144-146.*

NOTICE.—*Publication.*—A publication of notice of sale for nine successive weeks in a weekly newspaper, said period of nine weeks terminating two days before the sale, is sufficient compliance with §6109 Burns 1901.  *pp. 146, 147.*

AUDITOR OF STATE.—*Custodian of State Land Records.*—The transfer of the land records from the office of Secretary of State to the office of the Auditor of State, as provided by §7951 Burns 1901, carries with it the duty of recording in the latter office the deeds previously required to be recorded in the former.  *pp. 147, 148.*

MORTGAGES.—*To Secure Permanent Endowment Funds of University.*—*Sale.*—Where there is default in the payment of a mortgage to secure permanent endowment funds of the State University, the Auditor of State is not required to foreclose the mortgage, but may sell the mortgaged land by public advertisement without suit.  *p. 148.*

From Marion Superior Court; *J. M. Leathers*, Judge.

Suit by Abraham G. Brower and others against Emanuel S. Fisher to quiet title. From a decree for plaintiffs, defendants appeal. Transferred from **Appellate Court**, under §1337u Burns 1901. *Affirmed.*

*Pierre Gray* and *S. M. Richcreek*, for appellants.
*W. A. Ketcham* and *F. E. Matson*, for appellees.

HADLEY, J.—In July, 1893, the lands described in the complaint were mortgaged to the State for a loan from the permanent endowment fund. The note and mortgage contained the power of sale authorized by statute. In February, 1897, the lands were sold by the county treasurer for the delinquent taxes of 1895 and 1896, and the usual certificate was issued to the purchaser. In 1895 the lands were also assessed for a sewer, and in 1897 they were assessed for sprinkling. In April, 1898, upon default in the payment of interest, the Auditor of State, under authority of statute and the power of sale in the mortgage, and upon due publication, offered the lands for sale to recover the principal of the mortgage loan, with interest, damages, and costs. The lands were bid in by appellees, who were strangers to all other proceedings concerning the property. Upon payment of the amount bid, appellees received from the State a deed for the property. In January, 1899, appellant Fisher, trustee, purchased the tax certificate from the original owner, and in February, 1899, at the end of the two years after the tax sale, received from the county auditor a deed for the premises. In July, 1899, the appellant bond company purchased the sewer assessment against the property, and also, at a date unknown, but subsequent to 1897, purchased the sprinkling assessment against the property. Having learned that appellant Fisher, trustee, by virtue of his tax deed, and appellant bond company, by virtue of its sewer and sprinkling assessments, were each claiming to hold a lien upon the property, the appellees in April, 1900, brought against the appellants this suit to quiet title.

Fisher *v.* Brower.

The complaint sets out in detail the above and other material facts. The separate demurrer of each of the two appellants to the complaint, for insufficiency of facts, was overruled, and, each refusing to plead further, the court rendered judgment against them for cost, and a decree quieting appellees' title to the property in question.

The principal question in the case is, whether a purchaser, other than the State, at a permanent endowment fund mortgage sale, takes the property free from tax and assessment liens incurred after the execution of, and during the time the land was under the mortgage.

I. As ancillary to the main question appellants urge that the permanent endowment fund is a private fund, and not entitled to the constitutional and statutory protection accorded to public school funds, and that with respect to this particular fund the State acts merely as a trustee in making and collecting loans. An inquiry into the origin of the State University, for the maintenance of which institution the permanent endowment fund is exclusively designed, reveals the unmistakable purpose of the people to make the university a part of our public school system. Article 9, §2, of the Constitution of 1816 provided: "It shall be the duty of the General Assembly, as soon as circumstances will permit, to provide by law, for a general system of education, ascending in regular gradation from township schools to a state university, wherein tuition shall be gratis, and equally open to all."

In compliance with this mandate of the Constitution the legislature in 1820 established the State Seminary at Bloomington. Acts 1820, p. 82. In 1828 this institution was advanced to the dignity of Indiana College, an endowment fund established, its trustees required to report receipts, expenditures, etc., to the Governor, for submission to the General Assembly, and the constitution of the college declared to be unalterable by any law or ordinance of the trustees, "nor in any other manner, than by the legis-

lature of this State." Acts 1828, p. 115. By an act of 1838 (Local Laws 1838, p. 294), the General Assembly conferred upon the institution the name of Indiana University, and the same body in 1842 adopted a joint resolution,—reciting in terms §2 of article 9 of the Constitution of 1816 above quoted,—requiring the trustees of the Indiana University to report to the next legislative session, whether, in their opinion the resources of said university are sufficient to enable the legislature to pass a law making tuition gratis, in compliance with the constitutional mandate. Acts 1842, p. 174. In order that the special relation of the university to the State might be continued unquestioned, under the new Constitution of 1851, the General Assembly of 1852 enacted that "The institution established by an act entitled 'An act to establish a college in the State of Indiana,' approved January 28, 1828, is hereby recognized as the university of the State." 1 R. S. 1852, p. 504, 1 G. & H., p. 660. And again in 1867 the legislature asserted that it should be the pride of every citizen of the State to place the State University in the highest condition of usefulness and make it the crowning glory of our present great common school system. Acts 1867, p. 20.

The maintenance fund is in no smaller sense a state fund. It has its origin from the sale of certain lands of the State acquired by gift from the government for educational purposes. Acts 1828, p. 117. It has been augmented from time to time, as the needs of the university increased, by specific appropriations from the state treasury,—first in 1867 (§6159 Burns 1901); again in 1873 (§6160 Burns 1901); and by general taxation for twelve years beginning in 1883 (§6161 Burns 1901), and again in 1895 (Acts 1895, p. 171).

The university as well as its endowment has always been under the supervision of the State. Five out of its eight trustees are chosen by the state board of education. §6060

Burns 1901. Its trustees are required to report to the State. §6081 Burns 1901. The Governor shall annually cause 5,000 copies of the report to be printed, at the expense of the State, for distribution. §6084 Burns 1901. The trustees are required to provide for special instruction in certain branches. §§6088, 6089 Burns 1901. The State Librarian shall supply books to its library. §6092 Burns 1901. The State Geologist shall collect specimens of mineralogy and geology for its cabinet. §6093 Burns 1901. The home of the fund is the state treasury, and prior to April, 1897, it was loaned and collected by the state officers (Acts 1852, §§6095-6107 Burns 1901), and the annual interest thereon applied to the expenses of the university, upon warrants drawn on the Treasurer of State by the Auditor of State upon requisitions of the trustees. §6094 Burns 1901.

And as further evidence of the character of the fund, as construed and held by the people themselves, the legislature of 1897, with a prefatory declaration that "the people of the State are equally entitled to the use of said fund, and to its permanent protection," passed a law for the distribution of the fund to the several counties of the State, to be loaned and collected by the several county auditors, and the accruing interest annually reported and paid into the State treasury, at the time and in like manner as interest on the common school fund is paid; the second section of which act reads as follows: "The said moneys so distributed and paid to said counties, as provided by §1 of this act, shall be loaned by the auditors of the respective counties in the same manner, and on the same terms and conditions, and under the same restrictions, subject to the same limitations, and said loans shall be again collected from the borrower, as the common school funds are now loaned and collected. And the said several counties shall be liable in the same manner and to the same extent, for the principal and interest of said fund, and for the payment of the same, as they are now

liable for the payment of the interest and principal of the common school funds." Acts 1897, p. 117, §6116b et seq. Burns 1901.

We therefore conclude from the foregoing review of the subject that the Indiana University is an integral part of our free school system; that it was the special creation of the Constitution; that the protection and preservation of the funds belonging to it have been the special care of the General Assembly; and that its permanent endowment is in every material sense such a public educational fund as the Constitution declares "shall remain inviolate," and is perforce entitled to the same constitutional and statutory favoritism that is shown to other public educational funds. We are strengthened in this view by the manifest and uniform legislative purpose to treat the common school fund and the university fund as distinct, but as belonging to the same class.

With respect to the priority of the mortgage, the power of sale, and the sale on published notice, the respective governing statutes are almost identical. Compare §§5807, 5814, 5820 Burns 1901, with 6100, 6096, 6109 Burns 1901; and it is interesting to note that the provisions just referred to in both these laws are in effect and almost identical in form with the corresponding provisions of the university fund law of 1843. Compare above sections with §§39, 43, 53 R. S. 1843, pp. 245, 246. It may therefore be said, so far as material to the decision of this case, that the principles of the university fund law of 1843, carried into subsequent legislation, rule in the same way the management of all the educational funds of this State, including the permanent endowment fund.

II. This brings us to the main question: Does the sale by the Auditor under a permanent endowment fund mortgage devest the lien of a purchaser at a sale for delinquent taxes, and the lien for municipal improvement assessments, incurred after the execution of the mortgage and

before the sale thereunder? The statute relating to priorities is as follows: "Such, mortgages shall be considered as of record from the date thereof; and shall have priority of all mortgages or conveyances not previously recorded, and of all other liens not previously incurred in the county where the land lies." §6100, *supra.* Under the similar provision relating to the priority of school-fund mortgages, this court has heretofore held that the statute means what it plainly says, namely, that such a mortgage shall prevail against tax and all other liens subsequently incurred. *State, ex rel.,* v. *Jones,* 95 Ind. 175; *Stockwell* v. *State, ex rel.,* 101 Ind. 1, 9; *McWhinney* v. *City of Logansport,* 132 Ind. 9. See, also, *Hamilton* v. *State, ex rel.,* 1 Ind. 128; *Groom* v. *State, ex rel.,* 24 Ind. 255; *Schnantz* v. *Schellhaus,* 37 Ind. 85.

There can be no doubt of the power of the legislature, for the protection of the State's trust funds, to make the security therefor paramount to tax and all other liens created or authorized by the State. Tax liens, as well as improvement liens, exist wholly by virtue of the statute. As said in 25 Am. & Eng. Ency. Law, 267, "The lien does not arise by implication from the power to tax. Nor, when expressly created, can it be enlarged by construction; but, on the contrary, the statute providing for it is to be construed strictly." It follows that the power that may and does create liens,—that fixes their duration and limitation, that points out the purposes and the property to which they may attach,—has equal authority to give precedence to one class over another when deemed expedient to do so.

The facts of this case present no question of jeopardy to the State's revenue. When appellants acquired their liens they knew, or had the means of knowledge, and were therefore bound to know, that the State held the property in pledge for a loan from its university fund; and that the pledge was prior and paramount to all other liens subse-

uently obtained. At the treasurer's sale of the property for delinquent taxes, appellant Fisher's assignor, with knowledge of the prior encumbrance, bought Lander's right to redeem from the State's mortgage. He made the purchase with his eyes open, and whether the thing purchased was worth the sum paid was simply a matter of judgment, freely and voluntarily exercised. After the tax sale the case stood thus: The State still had its mortgage lien unimpaired, its taxes paid; and the purchaser had the right to perfect his title under the tax sale by paying off the State's claim. The same may be said of the contractors who performed work on the faith of promised assessments. These rights of redemption being so held by appellants, when the Auditor gave the required notice that he would enforce payment of the mortgage by sale of the property, it then became their imperative duty, if they would maintain their rights to redeem, to come forward and pay off the State's claim and save a final foreclosure. Failing to do so they are forever barred from enforcing them. *Schnantz v. Schellhaus,* 37 Ind. 85.

III. It is argued that the Auditor's sale was invalid for insufficient notice. The complaint charges that "Said Auditor of State advertised in the Weekly State Journal and the Weekly State Sentinel each a newspaper of general circulation printed in Marion county, Indiana, for sixty days continuously, said publications being on Wednesday of each week for nine successive weeks, the first of which publication was on February 16, 1898, and the last on April 13, 1898, that he would make public sale of said mortgaged premises * * * on the 21st day of April, 1898, at," etc. The contention being that for want of a publication on April 20th, the notice was not such as is required by §6109 Burns 1901, which provides that "the Auditor shall advertise the mortgaged property for sale in one or more of the newspapers printed in this State, for sixty days." The language of the statute is "shall adver-

tise in one or more of the newspapers printed in this State."
A weekly newspaper, which means a paper published but
once each week, or but once in each seven days, comes
within the requirements of the statute. One insertion in
such a paper must therefore be considered as a publication
continuing for seven days, or to the next regular day of
issue *(Nebraska, etc., Co.* v. *McKinley-Lanning, etc., Co.,*
52 Neb. 410, 72 N. W. 357); and a publication each week
for nine successive weeks is a publication for sixty-three
days. The first publication is alleged to have been made
February 16, 1898, and to have been repeated once a week
for nine weeks continuously to and including April 13th.
This was equivalent to an advertisement to and including
April 19th, which was two days before the sale, and was a
sufficient compliance with the statute. There is nothing
in *Brown* v. *Ogg,* 85 Ind. 234, in conflict with this view.

IV. The invalidity of the sale is asserted for the fur-
ther reason that appellees' deed is not alleged to have been
recorded in the office of the Secretary of State as required
by §6115 Burns 1901. The averment is "that said deed
was duly recorded in the office of the Auditor of the State
of Indiana in accordance with the provisions of §§6115,
7651 Burns 1901." The language of §6115, *supra,* is, "On
the production of the Treasurer's receipt for the purchase
money, the Auditor shall give to the purchaser, a certifi-
cate which shall entitle him to a deed for said land, to be
executed by the Governor of this State, and recorded in the
office of the Secretary of State." This latter statute was
enacted as §49 of the act of June 17, 1852 (1 R. S. 1852,
p. 504, 1 G. & H., p. 660), at a time when the Secretary
of State was the legal custodian of the record of such instru-
ments. But in 1877 the legislature, for the purpose of con-
centrating all the State's land matters in one place, created
a land department, and the office of land clerk, in the
Auditor of State's office. And to accomplish this concen-
tration it is provided in said act that the Secretary and

Treasurer of State, and all other public officers having the custody of any such records and papers, shall transfer to the Auditor of State "all the records pertaining to the swamp lands, State University lands * * * sale-books, tract-books, * * * all original land records * * * and all records pertaining to lands mortgaged to the various trust funds (viz., college fund, sinking fund, * * * and any other trust funds mortgaged to the State)." §7651 Burns 1901. The only proper place for the record of a deed, or other instrument, is in the office of the custodian of the record, and the transfer of the land records from the office of the Secretary of State to the office of Auditor of State must be held to have carried with it the duty of recording in the latter office the deeds previously required to be recorded in the former.

V. Finally it is insisted that the sale is illegal because it could only have been made by suit to foreclose, and not by public advertisement; the contention being that in the act of 1883 (§6164 Burns 1901), which creates the permanent endowment fund, it is not provided that the endowment shall be *collected* as provided by the act of 1853 relating to the university fund, and that the collection therefore is confined to the ordinary remedy prescribed for private individuals. The argument is not convincing. The language of the act of 1883 is, "In making loans, and disbursing interest collected the Treasurer of State and Auditor of State shall be governed by the law now in force regulating the manner of making loans of the university funds." Regulate means "to subject to governing principles, to rule, to govern." Webster's Int. Dict.

Under the law of 1883 the Treasurer and Auditor of State, in loaning the endowment funds were controlled *by the law* regulating—that is governing— the manner of making loans of university funds. To be governed by *the law,* is to be governed not only by a part but by the whole law relating to the subject. Besides, if these officers were to be gov-

erned by the law of 1853 (§§6095-6104 Burns 1901), then they were imperatively commanded, in making such loans, to require the mortgagor expressly to stipulate in the mortgage that upon default in the payment of interest the Auditor might sell the property for the collection of the loan. There can be no reason for requiring the Auditor to take a power of sale mortgage, if power to sell the property under it was withheld. If for no other reason than the requiring of a power of sale mortgage, it would seem certain that the whole law relating to the collection, as well as to the loaning of the fund, was adopted by §6164 Burns 1901.

Judgment affirmed.